## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

PUBLIC CITIZEN, INC., *et al.*,

     Plaintiffs,

v.

LOUISIANA ATTORNEY DISCIPLINARY
BOARD, *et al.*;

     Defendants.

Civil Action No. 08-4451

SEC. F (JUDGE FELDMAN)

MAG. 2 (MAG. JUDGE WILKINSON)

### PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS'
### MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

Defendants have produced no evidence that the advertising amendments enacted by the Louisiana Supreme Court, which prohibit a variety of common advertising techniques, accomplish any legitimate state purpose. Instead, they argue that plaintiffs lack standing to challenge the rules. As explained below, however, plaintiffs will face not only a restriction of their fundamental First Amendment rights, but severe economic hardship if the rules are allowed to go into effect. For these reasons, plaintiffs have standing to challenge the rules, and the Court should deny defendants' motion to dismiss and motion for summary judgment.

**ARGUMENT**

**I.     This Court Has Jurisdiction to Decide the Claims of Plaintiff Lawyers and Law Firms.**

The requirements of standing and ripeness are two aspects of Article III's limit of federal jurisdiction to "cases" and "controversies." *See United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000). Both are intended to ensure that cases in the federal courts are "presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Lamonica, J. v. L. E., Inc. J.*, 674 F.2d 359, 364 (5th Cir. 1982). The requirement that a case be justiciable is an important one, but equally important is the contrary principle that, when a case presents an actual controversy between the parties, it is the duty of the federal courts to enforce federal law. In such cases, the federal courts have a "virtually unflagging obligation" to exercise their jurisdiction. *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988). This is especially true in a case involving an injury to First Amendment rights. Although a plaintiff must still show justiciability in such cases, the requirements are "most loosely applied . . . where First Amendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001).

**A.     The Lawyer and Law Firm Plaintiffs Have Standing to Challenge the Rules.**

To demonstrate standing, a plaintiff must make a three-part showing: (1) that the plaintiff has suffered, or imminently will suffer, an injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury. *Id.* at 819-20. Plaintiffs easily meet these requirements here. As the Supreme Court wrote in *Lujan v. Defenders of Wildlife*, when a plaintiff is directly subject to the challenged government action,

"there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." 504 U.S. 555, 561-62 (1992).[1]

1.    **Plaintiffs Have Shown That They Are Injured by the Challenged Rules.**

The first element of the standing inquiry requires the plaintiffs to show that they have "sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *Id.* at 583. The injury need not be large; "an identifiable trifle" justifies review by a court. *Assoc. of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999). Even minor and temporary infringements of First Amendment freedoms constitute an injury sufficient to give rise to federal jurisdiction. *Croft v. Governor of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009).

The gist of defendants' argument is that plaintiffs lack standing because they have not shown that they will definitely be prosecuted if they violate the challenged advertising rules. Defendants' argument misconstrues the nature of plaintiffs' injury. Regardless of whether defendants intend to enforce the rule—and there is no reason to believe they do not—plaintiffs will be forced to stop running their advertisements and to design new ones in order to comply with the rules. This injury is "one of self-censorship; a harm that can be realized even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988); *see Houston Chronicle Pub. Co. v. League City*, 488 F.3d 613, 618 (5th Cir. 2007) (holding that a chilling effect is enough to give rise to injury for standing purposes). Plaintiffs are not required to violate the rules and put themselves at risk of enforcement before challenging the rules' restrictions on their speech. *See Houston Chronicle Pub. Co.*, 488 F.3d at 619 (holding that "a plaintiff stating

---

[1] Each element of the test "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. In the context of summary judgment, "the plaintiff must set forth by affidavit or other evidence specific facts . . . which for purposes of the summary judgment motion will be taken to be true." *Id.*

that he intends to engage in a specific course of conduct arguably affected with a constitutional interest . . . does not have to expose himself to enforcement to be able to challenge the law").[2]

The precise argument raised by defendants here was rejected by the Fifth Circuit in *International Society for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809 (5th Cir. 1979). There, plaintiffs sued for declaratory and injunctive relief against a restriction on fundraising at a city-owned airport. *Id.* As here, the defendants in *Eaves* argued that the federal courts lacked jurisdiction because there was no evidence that airport authorities had specifically threatened to enforce the ordinance. *Id.* at 821. The court disagreed, noting that plaintiffs need only show a "credible threat of enforcement"—i.e., a "probability that the challenged provisions . . . will be enforced against the [plaintiffs] if they violate it." *Id.* Because plaintiffs alleged that they wished to engage in practices that appeared to be prohibited by regulation, the court held that they had standing to challenge the regulation. *Id.*[3]

"[W]hen dealing with ... statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Rangra v. Brown*, 566 F.3d 515, 519 (5th Cir. 2009). Here, there

---

[2] *See also Al-Amin v. Smith*, 511 F.3d 1317, 1334 (11th Cir. 2008) (holding that a "chill" on speech constitutes a First Amendment injury); *Wilson v. State Bar of Georgia*, 132 F.3d 1422 (11th Cir. 1988) (holding that plaintiffs have standing where they would be "chilled from exercising [their] right to free expression or forgo[] expression in order to avoid enforcement consequences"); *N.H. Right to Life v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996) (same).

[3] In an analogous context, plaintiffs in environmental cases also generally proceed on the basis of affidavits alleging future injuries. In *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, for example, plaintiff environmental groups challenged a water-treatment plant's pollution emissions under the Clean Water Act. 528 U.S. 167 (2000). The plaintiffs demonstrated this injury with affidavits of members who used the affected areas for sports and recreation and who stated that they would be less likely to continue using those areas if the challenged pollution were to continue. *Id.* at 181-83. The Supreme Court held this showing sufficient to demonstrate standing, rejecting the defendants' contention that "demonstrated proof of harm to the environment" was necessary. *Id.* at 181. The courts in *Laidlaw* and other cases have held that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Id.* at 183. As in professional speech cases, it is the effect on the plaintiff's own activities that gives rise to the injury.

is no reason to believe the challenged rules will not be enforced. As in *Eaves*, the rules were "enacted only months ago," and thus the court can safely "assume that [enforcement authorities] will not disregard such a recent expression of the [Louisiana Supreme Court's] will." 601 F.2d at 821. Indeed, the state has never contended that it does not intend to enforce the rules or that it does not intend to enforce them against plaintiffs. On the contrary, the state has responded to this constitutional challenge by arguing that the rules are both constitutional and regulate activity that is "inherently misleading." The state would have no reason to adopt the challenged rules, or to defend their constitutionality, if it did not intend to enforce them, and there is no reason to believe the state will disregard activity that it regards to be inherently misleading to consumers.[4]

As the Fifth Circuit noted in *Eaves*, "[t]he Supreme Court has been most willing to allow anticipatory claims by plaintiffs" in challenges to commercial speech regulations because, in such cases, the plaintiffs' interest in practicing a profession ensures "that a constitutional challenge grows out of a genuine dispute and is not a contrivance prompted solely by a desire to enforce constitutional rights." *Id.* at 819. In such cases, "any probability of enforcement, however small, may deter even a genuinely interested plaintiff." *Id.* Since *Eaves*, a long line of cases has upheld anticipatory challenges to commercial speech regulations without any indication that a state official had specifically prohibited the plaintiffs' speech. For example, in *Edenfield v. Fane*, the Supreme Court held unconstitutional Florida's restrictions on solicitation by accountants. 507 U.S. 761 (1993). The plaintiff had not engaged in the prohibited forms of commercial speech but alleged that "but for the prohibition" he would have done so. *Id.* at 764. Similarly, in *Speaks v. Kruse*, a chiropractor brought a First Amendment challenge against a

---

[4] The Bar's *Handbook on Lawyer Advertising and Solicitation* makes clear that the rules are to be literally and rigorously applied even in cases where the challenged advertisement is not misleading. The handbook specifies, for example, that it would be deceptive to run an advertisement stating "Injured? Then You Need an Attorney!" because "a lawyer MAY be needed at some point but is not absolutely necessary if one is injured." Handbook at 40.

Louisiana statute precluding telephone solicitation of car-accident victims. 445 F.3d 396, 399 (5th Cir. 2006). The plaintiff practiced in Texas but alleged an intent to relocate his practice to Louisiana, where he intended to employ telemarketers to solicit people recently injured in car accidents. *Id.* Although there had been no specific threat of enforcement, the court held it sufficient that the plaintiff "formally alleges an intent to relocate[,] . . . has developed a business plan and expressed an unchallenged intent to follow it if he succeeds in this case." *Id.* Because a plaintiff in such cases can show a genuine interest in disobeying the statute, "the probability of enforcement is irrelevant to the existence of an Article III case or controversy." *Id.*[5]

There is no question that plaintiffs here are directly affected by the advertising rules and have a genuine interest in disobeying them. Plaintiffs have advertised their services on television and in other forms of media for many years and depend on advertising to sustain their practices. Bart Decl. (Exh. 1), ¶¶ 2-5; Gee Decl. (Exh. 2), ¶¶ 2-3. Plaintiffs have specifically alleged and stated in their declarations that they are currently running advertisements containing specific elements that violate the amended rules, and that, as a result of the rules, they are forced to produce new advertisements at significant expense that will be less effective than their original advertisements. Bart Decl. ¶¶ 3-12; Gee Decl. ¶¶ 4-9. Indeed, the challenged rules would restrict "[a]ll, or nearly all" of Bart's current advertisements. Bart Decl. ¶ 4. As Bart's declaration explains, almost all modern advertisements contain elements such as scenes, actors playing customers, and slogans that imply success or effectiveness. *Id.* ¶ 11. It would thus be difficult or impossible to develop any professional-looking advertising without violating at least one of the

---

[5] Defendants cite *Zauderer* and *Peel* as examples of cases where the Supreme Court decided a commercial speech issue on direct appeal from a state supreme court. Numerous other cases, however, have begun as anticipatory challenges to commercial speech restrictions where the state had not yet enforced, or threatened to enforce, its rules against particular plaintiffs. *See, e.g.*, *Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996); *Fla. Bar v. Went For It*, 515 U.S. 618 (1995); *United States v. Edge Broadcasting Co.*, 509 U.S. 418 (1993); *Byrum v. Landreth*, 566 F.3d 442 (5th Cir. 2009); *Allstate Ins. Co. v. Abbott*, 495 F.3d 151 (5th Cir. 2007).

amended rules. *Id.* Similarly, Gee's declaration establishes that the challenged rules will force him to design an entirely new advertising campaign at significant expense and that, as a result, the firm will suffer a loss of name recognition and will be forced to design relatively bland and ineffective ads that will be less effective at attracting potential clients. Gee Decl. ¶ 9. Both plaintiffs have stated that they would continue running ads containing elements prohibited by the rules if they were allowed to do so. Bart Decl. ¶ 12; Gee Decl. ¶ 10.

If anything, plaintiffs' allegations here are more concrete than those in *Speaks*. Whereas, in *Speaks*, the plaintiff had not even yet relocated to the state, plaintiffs here are already advertising in Louisiana and already engaging in the prohibiting advertising techniques. Thus, rather than alleging a hypothetical future impact, plaintiffs allege that the rules will force them to change their current behavior. For the same reason, this case bears no resemblance to *Harrell v. Florida Bar*, on which defendants rely. Case No. 3:08-cv-15-J-34TEM (M.D. Fla. Mar. 31, 2009). The district court in *Harrell* held that plaintiffs lacked standing because they had not explained what ads they wished to run in the future or how those "hypothetical" ads would violate the challenged rules. *Id.* In contrast, plaintiffs' claims here involve advertisements that they are currently running and wish to continue running in the future. There is nothing "hypothetical" about these ads.[6]

---

[6] The decision in *Harrell*, which is currently on appeal in the Eleventh Circuit, is in any case inconsistent with Fifth Circuit precedent, including *Allstate Ins. Co. v. Abbott*, 495 F.3d 151. In *Allstate*, defendants argued that, even if plaintiffs had standing to challenge advertising rules as applied to a specific advertisement, the court should not declare the provisions facially invalid. *Id.* at 168. The Fifth Circuit disagreed, noting that it was not merely the challenged law's effect on a particular advertisement, but its blanket prohibition of an entire category of advertising that was unconstitutional. *Id.* Under the rule urged by defendants, however, a federal court could not declare a rule facially unconstitutional as long as there was a potential for a future, as-applied challenge to the rule.

### a.    References to Past Results

Plaintiffs "frequently run advertisements with references to past successes and results, including past verdicts on behalf of clients." Statement of Undisputed Facts ¶ 29; Bart Decl ¶ 7; Gee Decl. ¶ 5. These advertisements are unambiguously prohibited by the rule against references to past results. Indeed, defendants appear to concede that these practices are prohibited, citing to a portion of the Bar's advertising handbook that gives as an example of a prohibited ad: "John Smith . . . helped me recover $100,000.00 for my auto accident." Handbook at 8. In another example, the handbook specifies that it would violate the rule to state "[O]ur firm has had many past successes in handling cases similar to yours, in some instances recovering over $400,000 for some of our clients." Handbook at 46. These prohibited statements are indistinguishable from numerous statements in plaintiffs' ads, including the statement in Gee's ads that he "has recovered many millions of dollars for his clients." Gee Decl. ¶ 6.

### b.    Actors, Scenes, and Spokespeople

Plaintiffs also use advertising that includes portrayal of clients by non-clients and generic scenes that would be prohibited by the amended rules, including generic accident and hospital scenes. Bart Decl. ¶ 8; Gee Decl. ¶ 7. These advertisements are unambiguously restricted by the face of the challenged rules. Moreover, the advertising handbook specifically states that a photograph of a wrecked car would violate the rule if it is not "a photo of an actual or authentic car accident." Handbook at 40. Also restricted is plaintiffs' use of spokespeople. Bart Decl. ¶ 9; Gee Decl. ¶ 4, 8. Gee's use of Robert Vaughn in his advertisements, for example, would run afoul of the rules. Gee Decl. ¶ 4.

### c. Promises of Results and Slogans that Imply the Ability to Achieve Results.

Plaintiffs have also shown how their advertisements would violate the rules against promises of results and slogans that imply an ability to obtain results. Although plaintiffs' advertisements do not explicitly promise that they will prevail in any given case, such an explicit promise is not required to violate the rules. The Bar's advertising handbook, for example, states that an advertisement impermissibly implies an ability to achieve results if it "[s]tates or implies directly a positive result or pattern of positive results" or "[m]akes a comparison with another lawyer, law firm or lawyers in general." Handbook at 9. The handbook explains that the rule would prohibit such slogans as "Better Than the Rest," "The Premier Lawyers," and "After you've tried the rest, come to the best!" *Id.* The handbook also provides that it would impermissibly promise results for a lawyer to use the designation "The Golden Retriever," presumably because it "promises" that the lawyer will "retrieve" something on behalf of the client, or "If you choose to hire this firm, our fee will be based upon a percentage of the total recovery we obtain for you," because there may be no "total recovery" in any given case. *Id.* at 42. None of these statements promise or imply a positive outcome in a particular case. Nevertheless, they are all prohibited by the rules because they suggest that the lawyer will provide a certain level of performance as compared with other lawyers.[7]

---

[7] Florida has applied its identical rule against promises of results to prohibit similar ads, including: "Don't let an incident like this one ruin your life," "Don't allow the American dream to turn into a nightmare," and "Attorneys Righting Wrongs." Florida Bar, Relevant Decisions by the Standing Committee on Advertising, Second Harrell Decl. Exh. 12, Harrell v. Fla. Bar, No. 08-cv-015 (M.D. Fla. Sept. 15, 2008) (No. 29, Attach. 1) ("Relevant Decisions") (Beck Decl. Exh. 26), at 21, 28, 36. Other states have also read "Super Lawyer" to be prohibited under similar rules. *See* N.J. Ethics Op. 39 ("When a potential client reads such advertising and considers hiring a 'super' attorney, or the 'best' attorney, the superlative designation induces the client to feel that the results that can be achieved by this attorney are likely to surpass those that can be achieved by a mere 'ordinary' attorney.").

The statements that the handbook specifies to be prohibited are indistinguishable from plaintiffs' slogans, including Bart's mottos "One Call, That's All" and "One Click, That's It," and Gee's slogan "Tell them you mean business." Indeed, defendants' refusal to admit that plaintiffs' slogans run afoul of the rule is puzzling given that the only evidence the LSBA Committee reviewed in considering the rule is a survey in which 61% of respondents stated that plaintiffs' slogans and other similar slogans "promise[d] that the lawyer will achieve a positive result." *See* SCI Research, *Research Findings* (Pls.' Mot. for Summ. J. Exh. 37), at 14, 17. This finding suggests that the LSBA Committee, in addition to the general public, believes plaintiffs' slogans violate the rules.

Bart has spent tens of thousands of dollars developing an advertising campaign centered around his slogan and only after years of development managed to obtain a high level of brand recognition that has been successful at bringing clients to the firm. *Id.* ¶ 3. Prohibiting the slogan would not only cost the firm thousands of dollars, but it would also cause the firm to lose public recognition and, thus, client business. *Id.* ¶ 5. It would take years and millions of dollars of investment before Bart could reach the same level of recognition under a new advertising campaign. *Id.* Similarly, Gee's slogan has obtained substantial public recognition and has been successful at bringing clients to the firm. Gee Decl. ¶ 4. Plaintiffs have also identified other portions of their advertising that would run afoul of both rules. Bart's ads include the statement "I'll work hard to get you all the money you deserve" and "Super Lawyer." Gee's include "get the benefits you deserve" and "you need an experienced maritime attorney who can get the job done." Bart Decl. ¶ 10; Gee Decl. ¶ 5. These slogans are not distinguishable from other slogans that the state's survey suggests would run afoul of the rule against promises of results, including

"Before you accept a quick check, check with me," "Don't get muscled around," "Want big results? Call us," and "Where a fair settlement is no accident." *Research Findings* at 14.

Tellingly, defendants never claim that plaintiffs' ads *do not* violate the challenged rules. Instead, they suggest that, before allowing plaintiffs to bring their First Amendment challenge, the Court should require them to obtain an advisory opinion from the Bar, relying on *Felmeister v. Office of Attorney Ethics*, 856 F.2d 529 (3d Cir. 1988). In holding that an attorney could not bring a pre-enforcement challenge to the state's advertising rules, *Felmeister* held that the case was "distinguishable from Supreme Court decisions striking down attorney advertising regulations" because all the decisions before that time had been appealed through the state court systems to the Supreme Court. *Id.* at 537 n.10. Since then, however, the Supreme Court, the Fifth Circuit, and other courts have decided numerous anticipatory challenges to commercial speech restrictions and held that refraining from engaging in prohibited speech is enough to create standing. *See supra*, note 4. In any case, it is not clear what would be accomplished by requiring plaintiffs to obtain an advisory opinion given that the rules specifically provide that such advisory decisions are not binding on anybody. *See* Rule 7.7(h); Handbook at 48 ("Advisory opinions issued by the Committee through LSBA Ethics Counsel on matters related to lawyer advertising and solicitation are purely informal, advisory in nature and shall not be binding on anyone, including the Office of Disciplinary Counsel.").[8]

Plaintiffs need not prove for a certainty that their ads will be held to violate the challenged rules. As already explained, it is not the enforcement itself, but the chilling effect resulting from the *risk* of enforcement that gives rise to standing in a First Amendment case like

---

[8] Defendants also rely on a district court case, *Bell v. Legal Advertising Comm.*, 998 F. Supp. 1231, 1236-37 (D.N.M. 1998), for the proposition that a lawyer is required to exhaust state remedies before bringing a First Amendment client. *Bell*, however, runs headlong into Supreme Court precedent holding that a state may not condition access to federal courts under 28 U.S.C. § 1983 on exhaustion of a state administrative process. *Patsy v. Board of Regents of State of Fla.*, 457 U.S. 496 (1982).

this one. The "credible threat of enforcement" standard, as set forth in *Eaves* and other cases, establishes a "low threshold," requiring the plaintiff only to show that the "probability that the challenged provisions . . . will be enforced" is more than "chimerical" or "imaginary." *Id.; see also Rangra*, 566 F.3d at 519 ("The standard—encapsulated in the phrase 'credible threat of prosecution'—is quite forgiving."). As long as there is "some reason [for] fearing prosecution," this requirement is satisfied. *Eaves*, 601 F.2d at 819. Plaintiffs easily satisfy the standard here.[9]

Finally, to the extent that any uncertainty remains about whether plaintiffs' ads violate the rules, that uncertainty does not benefit defendants. If defendants are unable to reach a conclusion as to whether plaintiffs' ads comply with the rules, there is no reason to believe that lawyers like plaintiffs will be able to reach a conclusion either. If the rules are not clear enough to provide guidance to plaintiffs on whether their ads comply, plaintiffs have standing to challenge the rule on grounds of vagueness. In that case, the lack of prior enforcement or a specific threat against the plaintiff would be irrelevant. *CAMP Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257 (11th Cir. 2006) ("[I]t is the existence, not the imposition, of standardless requirements that causes [the] injury.").

---

[9] *See also MainStreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 744 (7th Cir.2007) ("[S]tanding in the Article III sense does not require a certainty or even a very high probability that the plaintiff is complaining about a real injury, suffered or threatened."); *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006) (holding that the "nonspeculative risk that the [defendant] would construe [plaintiffs'] ads" to violate a challenged law "constitutes sufficient injury to confer standing to challenge the constitutionality of the [challenged law] on its face"); *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 762, 764 n.1 (11th Cir. 1991) ("definitely and seriously want[s] to pursue a specific course of action which they knew [is] *at least arguably forbidden* by the pertinent law."); *Jacobs*, 50 F.3d 901, 903 n.8 (holding that plaintiffs had standing to challenge lawyer advertising rules where they alleged that they wanted to produce and use advertisements "which are, or may be violative of the new rules").

2.     **Plaintiffs' Allegations Satisfy the Remaining Requirements for Standing.**

In addition to showing an actual injury, a plaintiff seeking to establish standing must also show that the injury was caused by the defendant and is redressable by the court. In many cases, including this one, these last two elements of the test are closely related, because, if the defendant is the cause of the plaintiff's injury, it is likely that a remedy granted against that defendant will redress the injury. Here, for the same reasons that plaintiffs have shown that they are injured by the rules, they have also shown that the injury is traceable to the defendants' implementation and enforcement of those rules and therefore that the injury is redressable. *See Allstate Ins. Co.*, 495 F.3d at 159-60 (holding in a commercial speech case that "causation and redressability [were] easily satisfied" because the challenged law would impose penalties on the plaintiff and a declaration of unconstitutionality would allow the penalties to be avoided).

Defendants argue that causation and redressability are too speculative, relying on *Lujan*, 504 U.S. 555. *Lujan* involved a challenge by an environmental group to a regulation promulgated under the Endangered Species Act. *Id.* Although the Act required agencies to consult with the Secretary of the Interior before taking any action that might affect endangered species, the challenged regulation exempted actions taken in foreign nations. *Id.* at 557-58. To establish injury, a Defenders of Wildlife member submitted an affidavit stating that she had gone to Egypt six years earlier and observed the traditional habitat of the endangered Nile crocodile. *Id.* at 563. Though she had not seen the crocodile itself, she alleged that she "intend[ed] to" return to Egypt and "hope[d] to observe the crocodile directly." *Id.* Based on this affidavit, the group argued that the failure of an agency involved with construction of the Aswan High Dam to consult with the Secretary of the Interior about the crocodile "increas[ed] the rate of extinction of endangered and threatened species," and thus risked depriving the member of the opportunity to

see the crocodile the next time she visited. *Id.* at 562-63. The Court rejected this basis for standing, holding that the member's "some day" intentions to return could not support a finding of an "actual or imminent" injury. *Id.* at 564.

The injury at issue in *Lujan* was the reduction in probability that a Defenders of Wildlife member would see an endangered crocodile in Egypt. Such an injury is far more uncertain and attenuated than plaintiffs' claim that the challenged rules prohibit them from continuing to run their current advertisements, which are the basis for their livelihoods. Moreover, the injury in *Lujan* (failure to see a crocodile) would happen, if at all, only in the uncertain future, while plaintiffs' injury (chilling effect on their speech) is occurring now. Finally, as the Court noted in *Lujan*, the likelihood that one statutorily mandated conference with the Department of Interior would have any effect on the likelihood of seeing a crocodile was remote. Plaintiffs' injury, however, would be remedied at the moment the advertising rules were declared unconstitutional because they would no longer be subject to the restrictions and could thus continue to run their current ads. *Lujan* itself recognized that when a plaintiff is directly subject to the challenged government action, as plaintiffs are subject to the advertising rules, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." 504 U.S. at 561-62.

Defendants also argue that plaintiffs' injury is not redressable because they have not shown that their advertisements comply with other, unchallenged advertising rules. Defendants rely for this proposition on *K.H. Outdoor, L.L.C. v. Clay County, Florida*, 482 F.3d 1299 (11th Cir. 2007). There, the Court held that an as-applied challenge to a billboard regulation did not involve a redressable injury because, even setting aside the challenged regulation, the specific billboard at issue was too large to be displayed under the law. The plaintiff in *K.H. Outdoor*,

however, challenged the regulation only as it was applied to a specific billboard and not, as in this case, in its entirety. Evidence that, regardless of the court's ruling, the billboard could not be displayed therefore established that the injury was not redressable. In other contexts, however, the Supreme Court has made clear that an injury may be redressed by a favorable decision even if hypothetical factors beyond the court's control may ultimately frustrate relief. *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case-even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason.").[10]

### 3. Plaintiffs' Claims Are Ripe.

The question of ripeness asks "whether the claim is sufficiently mature, and the issue sufficiently defined and concrete, to permit effective decisionmaking by the court." *Konikov v. Orange County, Fla.*, 410 F.3d 1317, 1322 (11th Cir. 2005). The doctrine has both constitutional and prudential dimensions. Constitutionally, ripeness implements Article III's case-or-controversy requirement by demanding that a plaintiff show that an injury either has occurred or is imminent enough to create a genuine dispute between the parties. *See, e.g., Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 81 (1978). In this respect, ripeness overlaps with standing's requirement of an actual injury. The prudential components of the ripeness test set forth an approach to determining whether judicial intervention is appropriate or should be

---

[10] *See also Utah v. Evans*, 536 U.S. 452 (2002) (injury redressible where favorable decision "would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly addresses the injury suffered); *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262 (11th Cir. 2001); *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1179 (9th Cir. 2000) (holding that even if a court decision led to the same injury via a different exchange, if the exchange in question was unlawful it must be set aside: "What the parties do after that is up to them, and is not before us."); *Jacobs v. Fla. Bar*, 50 F.3d 901 (11th Cir. 1995) (holding that, where plaintiffs challenged lawyer advertising rules "in their entirety," the court "would not benefit from . . . production of a nonmisleading dramatization or testimonial").

postponed until events create a greater need for review. Two inquiries are relevant to this question: "1) whether the issues are fit for judicial decision and 2) the hardship to the parties of withholding court consideration." *Konikov*, 410 F.3d at 1322. In this case, both factors strongly support the Court's jurisdiction.

### a.    Fitness

The "fitness" inquiry focuses on whether the plaintiff's claims present legal issues appropriate for judicial resolution without more factual development or whether the courts' ability to review the action would be enhanced by awaiting a challenge to a specific application. *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003); *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 171 (1967). Cases are particularly likely to be considered fit for review in a facial challenge to a regulation, where the issues are purely legal and do not depend on a particular application of the rule. In such cases, the Supreme Court has consistently deemed challenges presumptively fit for review. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967); *see also Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 756-57 (D.C. Cir. 2003) ("[W]e ask first whether the issue raised in the petition for review presents a purely legal question, in which case it is presumptively reviewable.").

Plaintiffs' challenge here is "purely legal" because it raises only the question whether the state can demonstrate that the challenged rules are constitutional under the test set forth by the Supreme Court in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980). *Central Hudson* requires the state to put forward the evidence on which it relied when it enacted the challenged rules and does not require analysis of the effect of the rules on any particular advertisement. It is thus particularly well suited for facial review. As the Fifth Circuit noted in *Allstate*, the Supreme Court has frequently addressed facial challenges to

restrictions on commercial speech under the *Central Hudson* test. 495 F.3d at 168 & n.67; *see also supra*, note 4.

Moreover, the parties have now completed written discovery and have fully briefed and argued the constitutionality of the challenged rules on cross-motions for summary judgment. In the process, the state submitted the evidence on which it purported to rely in creating the rules and made its argument that this evidence is sufficient to support the rules' constitutionality. Requiring the process to be repeated would burden both the parties and the courts without serving any purpose. *See Payne Enters. v. United States*, 837 F.2d 486, 492 (D.C. Cir. 1988) (holding that a case was ripe when "nothing would be gained by postponing its resolution").

### b. Hardship

The "hardship" inquiry seeks to identify circumstances that override the interests in postponing review. The analysis examines not only whether the plaintiff has shown injury imminent enough to create a case or controversy, but also whether postponing review would itself create hardship. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). The Supreme Court has noted that a "major" circumstance where hardship will render a facial challenge ripe is when "a substantive rule . . . as a practical matter requires the plaintiff to adjust his conduct immediately." *Lujan*, 497 U.S. at 891. That is precisely the situation here. Plaintiffs depend on advertising for their livelihoods, and regulations restricting their ability to advertise therefore have a "direct and immediate" effect on their "day-to-day business." *Abbott*, 387 U.S. at 152. To comply with the rules, plaintiffs will have to discard their current advertising and design new advertisements at great expense. Bart Decl. ¶¶ 3-11; Gee Decl. ¶¶ 3-9. Moreover, as plaintiffs explain in their declarations, complying with the challenged rules forces them to make relatively bland, uninteresting advertisements that convey less information and make it more difficult for them to recruit clients. *Id.*

The Supreme Court has also held that requiring a plaintiff "to proceed without knowing whether [a regulatory scheme] is valid would impose a palpable and considerable hardship." *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 581 (1985). If this Court were to deny jurisdiction here, plaintiffs would suffer "the continuing uncertainty and expense" of complying with the regulatory scheme even though they contend that the rules are unconstitutional. *Id.* Moreover, because it is very expensive to develop advertising, especially television advertising, plaintiffs will be forced to cut any content that even arguably implicates the rules to avoid the risk that the ads will be denied. Bart Decl. ¶ 6. If this Court were to refuse to decide the First Amendment issue here, plaintiffs could never know whether a particular advertisement were permissible until they had already made this significant investment and paid the Bar's filing fee. They will thus continue to be forced into self-censorship, limiting their advertisements in an effort to maximize their chances for Bar approval. *Id.* The end result of this process would be to force plaintiffs into litigating their First Amendment rights at their own expense, on a case-by-case basis, spending enormous amounts of money and time on each new advertisement that they wish to air. Requiring plaintiffs to submit to this process would not only serve no purpose, it would in itself add additional burdens to their First Amendment expression. *Cf. Zwickler v. Koota*, 389 U.S. 241, 252 (1967) ("[T]o force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might  itself effect the impermissible chilling of the very constitutional right he seeks to protect.").

Finally, facial challenges to agency rules are particularly likely to involve hardship justifying review when refusal to hear the facial challenge would frustrate a plaintiff's ability to bring a later as-applied challenge. In such circumstances, "delayed review would cause hardship to the plaintiffs" because they do not have "ample opportunity later to bring [their] legal

challenge at a time when harm is more imminent and more certain." *Ohio Fo*restry, 523 U.S. at 733, 734. Here, because plaintiffs can never know when a complaint against their advertising will be filed, there will not be any warning before the disciplinary process has actually begun. Once the process does begin, however, the Bar can argue that the federal courts should abstain in favor of the ongoing state process. Thus, any holding that plaintiffs may not bring a challenge until discipline has been threatened means that they will lack standing to bring suit in federal court until it is already too late. As a result, plaintiffs will be effectively left without access to the federal district courts.

### B. Public Citizen Has Standing to Defend the First Amendment Rights of Its Members.

Defendants also argue that Public Citizen lacks standing to challenge the rules. Plaintiffs, however, allege sufficient facts to establish Public Citizen's standing. Plaintiffs allege that Public Citizen is a nonprofit public interest organization with members in Louisiana that includes as part of its mission the protection of consumer rights and freedom of speech. Berwager Decl. (Exh. 3), ¶ 2; Wolfman Decl. (Exh. 4), ¶¶ 2-3. Public Citizen is particularly interested in the availability of truthful legal advertising because speech in that context not only encourages beneficial competition in the marketplace for legal services, but can also educate consumers about their rights, inform them when they may have a claim, and enhance their access to the legal system. Wolfman Decl. ¶ 3. The state's restrictions on lawyer advertising injure Public Citizen's Louisiana members, who are consumers of legal services, by preventing them from receiving information that they have an interest in receiving. *Id.* ¶ 4. Given the state's broad restriction on common advertising techniques, it is not only likely, but inevitable, that Public Citizen's members will be deprived of advertising as a result of the rules.

The Supreme Court's recognition of First Amendment protection for commercial speech was based primarily on the value such speech brings to consumers, and the Court has thus held that consumers, and the groups that represent them, have standing to contest restrictions on commercial speech. In *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, the first Supreme Court case to recognize the right to commercial free speech, the plaintiffs were not pharmacists who had been denied the right to advertise, but consumer groups representing their members' right to receive commercial drug advertisements. 425 U.S. 748, 754 n.10 (1976). The Court held the consumer groups had standing to oppose the advertising restrictions, writing that, "[i]f there is a right to advertise, there is a reciprocal right to receive the advertising, and it may be asserted by these [plaintiffs]." *Id.* at 757. In recognition of this principle, numerous courts have recognized Public Citizen's standing to litigate on behalf of its members, including in cases challenging lawyer advertising regulations.[11]

## II.   The Challenged Advertising Rules Are Unconstitutional.

On summary judgment, defendants have the burden of proving that a restriction on commercial speech is constitutional. *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009). To meet this burden, they must show—with actual evidence—that the harms the state seeks to address are real and that the chosen restraints will alleviate those harms to a substantial degree. *Edenfield*, 507 U.S. at 770-71. Here, the only justification for the rules argued by defendants is the prevention of advertising they claim to be "inherently" or "potentially" misleading.[12]

---

[11] *See Schwartz v. Welch*, 890 F. Supp. 565 (S.D. Miss. 1995) (holding that Public Citizen had standing to contest restrictions on lawyer advertising rules on behalf of its Mississippi members); *Alexander v. Cahill*, No. 07-117, 2007 WL 1202402 (N.D.N.Y., Apr. 23, 2007) (holding that Public Citizen had standing to challenge lawyer advertising rules in New York on behalf of its members there).

[12] Notably, defendants do not argue that they have a legitimate interest in promoting the dignity of the legal profession or the court system, even though the Louisiana Supreme Court claimed this as the interest motivating adoption of the rules.

Although defendants claim to have "ample evidence" that the rules advance this claimed interest, they never say what that evidence is. Defendants rely exclusively on the LSBA Committee's *Report and Recommendations*, which asserts that the prohibited advertising devices are "inherently misleading." What is conspicuously absent from the committee's report is any evidence that even a single lawyer in Louisiana has used the prohibited techniques in a way that is misleading, or that any consumers have ever been misled by these devices. The unsubstantiated opinions of committee members have no more evidentiary value than the unsubstantiated opinion of the state. *Edenfield*, 507 U.S. at 770 (holding that the state's burden is "not satisfied by mere speculation or conjecture"); s*ee Byrum*, 566 F.3d 442 (rejecting state's reliance on legislative report and survey that included no evidence in support of the state's burden). Reliance on the report is especially dubious given that it was produced during litigation and for the purpose of defending the constitutionality of the state's ruled. Such a report holds no more evidentiary value than the state's brief.[13]

Indeed, as the Louisiana Supreme Court has acknowledged, its true interest in this case is not to prohibit speech that is *actually* false or misleading, but to prohibit speech that is "potentially misleading." Press Release, Louisiana Supreme Court (June 4, 2009) (Mot. for Summ. J. Exh. 36). This basis for speech restrictions has repeatedly been asserted by states and repeatedly rejected by the Supreme Court. *See, e.g., Ibanez v. Fla. Dep't of Bus. & Prof'l Reg.*, 512 U.S. 136 (1994) (holding that courts "cannot allow rote invocation of the words 'potentially misleading' to supplant the [state's] burden"). In *RMJ*, for example, the Court struck down a

---

[13] Defendants make no mention of the survey on which the LSBA Committee purported to rely, presumably because large majorities of respondents thought that the restricted techniques were not misleading. As plaintiffs explain in their memorandum in support of their motion for summary judgment, and as further explained in the attached expert reports (Exhs. 5-7), the survey provides no evidence in support of the rules. Among many other flaws, the survey was not directed at the target audience for attorney advertising and thus surveyed the wrong audience.

restriction preventing a lawyer from truthfully advertising that he was a member of the United States Supreme Court Bar. 455 U.S. 191 (1982). Although the Court noted that the statement "could be misleading to the general public unfamiliar with the requirements of admission to the Bar of this Court," it found "nothing in the record to indicate that the inclusion of this information was misleading." *Id.* at 205-06. Similarly, the Supreme Court in *Peel v. Attorney Registration and Disciplinary Commission* held that the state violated the First Amendment by disciplining a lawyer for stating on his letterhead that the National Board of Trial Advocacy had certified him as a civil trial specialist. 496 U.S. 91 (1990). The Court rejected the state's "paternalistic assumption" that "the average consumer" would be confused or unable to understand the value of the certification. *Id.* at 105-06 & 106 n.13.

### A.    References to Past Results

In support of its prohibition on statements of past results, defendants offer only conclusory statements that such statements are "inherently misleading." Defendants offer no evidence—or even a common-sense reason—why consumers would be misled by this widespread advertising device. Plaintiffs have pointed to numerous instances in which lawyers in Louisiana, including defendants' counsel and members of the disciplinary board, have advertised past successes in their own cases in circumstances that are not even arguably misleading. *See Bates v. State Bar of Ariz.*, 433 U.S. 350, 372 (1977) (rejecting the state's argument that lawyer advertising is "inherently misleading" because "such services are so individualized with regard to content and quality as to prevent informed comparison on the basis of an advertisement").

Nor does the state offer any evidence in support of its claim that "it would be nearly impossible to offer/provide enough facts and details to adequately disclaim a past result of success." As plaintiffs have pointed out, other states allow references to past successes when accompanied by a disclaimer such as "past results do not indicate future success." Defendants do

not explain what other "facts and details" would need to be added to this disclaimer to achieve its goals. *See Central Hudson*, 447 U.S. at 562 ("Even when advertising communicates only an incomplete version of the relevant facts, the First Amendment presumes that some accurate information is better than no information at all.").

Lacking any serious attempt to tailor the rule to the alleged harm, defendants argue that the fit between its interest and the regulations "need not be perfect," citing *Board of Trustees v. Fox*, 492 U.S. 469 (1989). The state *does* have to show, however, that the rules' "scope is in proportion to the interest served" and that the rules are "narrowly tailored to achieve the desired objective." *Id.* at 480 (internal quotation marks omitted). Moreover, the state must make this showing with actual evidence. *Id.* Here, the state's only effort to show that the rule is narrowly tailored is to argue that lawyers can still communicate *other* kinds of factual information about their services, such as "the number of years they have practiced law." It is not, however, a justification for restrictions on speech that the restricted speaker will have other things to say. The question is not whether the speaker is permitted to say other things, but whether the government has achieved its goals in a narrow manner. The state has made no attempt to do so.

## B. Actors, Scenes, and Spokespeople

Defendants concede that these advertising techniques are "frequently used in many advertising campaigns," but point to no evidence that any consumer has ever been misled. Nor is there any reason to believe that consumers would be misled by advertising devices they see on television every day. *See Peel*, 496 U.S. at 105 (warning that states should not treat consumers of legal services as "no more discriminating than the audience for children's television"); *Dunagin v. City of Oxford, Miss.*, 718 F.2d 738 (5th Cir. 1983) ("Our policy is to leave it to the public to cope for themselves with Madison Avenue panache and hard sells.").

Rather than arguing any legitimate interest in the rules, defendants argue only that the rules impose a disclaimer rather than an outright prohibition on speech. However, the fact that the rules merely burden speech rather than prohibiting it entirely does not excuse the state from presenting evidence that the rules serve a legitimate state purpose and are no more substantial than necessary to serve that interest. "Even partial restrictions on commercial speech must be supported by a showing of some identifiable harm." *Mason v. Fla. Bar*, 208 F.3d 952, 958 (11th Cir. 2000). As plaintiffs have explained, the burden here is substantial. Time is valuable in television advertising, and the requirement of verbal disclaimers will make it very difficult or impossible to run advertisements that are fifteen seconds or shorter. Bart Decl. ¶ 9. Moreover, the size and number of required disclaimers make it impossible to make effective print or broadcast advertisements.

Defendants have presented no evidence that any legitimate purpose justifies this overwhelming burden on speech. At most, the restriction is a prophylactic rule designed to protect against hypothetical cases of abuse. Although broad prophylactic rules may be easier to administer than narrowly tailored ones, the state may not broadly suppress truthful advertising "merely to spare itself the trouble of distinguishing such advertising from false or deceptive advertising." *Zauderer*, 471 U.S. at 646. If the state encounters a misleading use of actors and scenes, the state may prohibit it under its rules against false and misleading advertising but may not ban all such ads on the ground that it might one day encounter one that is misleading.

Again without any evidence, defendants argue that "portrayals of judges can lead consumers into believing that an advertising attorney has the power to influence court proceedings in ways that are wholly unrealistic." There is no reason to believe, however, that consumers seeing a portrayal of a judge would conclude that the advertising lawyer can or would

exert an improper influence. The state has not brought forward even a single example of an ad that is misleading in this way, nor has it provided evidence that any consumer has ever been confused by a depiction of a judge. Defendants correctly point out that rules governing judges prohibit judges from appearing in advertisements, but this fact only demonstrates that the rule is vastly overbroad. Because the state *already* prohibits the appearance of actual judges, the rule could only apply to portrayal of *fictional* judges. In such cases—such as the depiction of a generic trial scene—there is no risk of confusion. Nor can there be any reason for prohibiting depictions of juries. Given that juries are randomly selected in each case, no consumer could believe that depiction of even a *real* jury would suggest an influence by a lawyer in future cases.

### C.     Promises of Results and Slogans that Imply the Ability to Achieve Success.

As to the rule against promises of results, defendants argue only that "there is no way to know definitively what the outcome of any given case will be." Plaintiffs, however, have never disputed the state's authority to prohibit a lawyer from promising victory in a particular case. Indeed, such a statement would be false and subject to prohibition on that basis alone. The state has no interest in prohibiting general statements of quality that could be construed as promises of results, such as plaintiffs' slogans "One call, that's all," and "Tell them you mean business." Defendants claim they are "unaware of any instance where this Rule has been applied" in such circumstances, but, as explained above, the LSBA Committee's own survey and handbook on advertising suggest that the slogans would be covered.

### CONCLUSION

The Court should deny defendants' motion to dismiss and motion for summary judgment.

Respectfully submitted,


  /s/ James M. Garner
James M. Garner, La. Bar No. 19589, T.A.
Joshua S. Force, La. Bar No. 21975
Christopher T. Chocheles, La. Bar No. 26848
SHER GARNER CAHILL RICHTER
KLEIN & HILBERT, L.L.C.
909 Poydras St., 28th Floor
New Orleans, LA   70112
Telephone:  (504) 299-2100
Facsimile:  (504) 299-2300
Email:  jgarner@shergarner.com

--- and ---

Terry B. Loup, La. Bar No. 8823
MORRIS BART, L.L.C.
20th Floor
909 Poydras Street
New Orleans, Louisiana  70112
Phone: (504) 599-3254
Fax: (504) 599-3380
Email: tloup@morrisbart.com

*Counsel for Plaintiffs Morris Bart and Morris Bart, L.L.C.*


  /s/Gregory A. Beck
Gregory A. Beck
DC Bar No. 494479, pro hac vice
Brian Wolfman
DC Bar No. 427491, pro hac vice
PUBLIC CITIZEN LITIGATION GROUP
1600 20th St., NW
Washington, DC  20009
Phone:  (202) 588-1000
Fax:  (202) 588-7795
Email: gbeck@citizen.org
        brian@citizen.org

*Counsel for All Plaintiffs*

  /s/ Dane S. Ciolino
Dane S. Ciolino, T.A., La. Bar No. 19311
DANE S. CIOLINO, LLC
P.O. Box 850848
New Orleans, LA 70185-0848
Phone: (504) 834-8519
Fax: (504) 324-0143
Email: dciolino@loyno.edu

*Counsel for Plaintiffs Public Citizen, Inc., William N. Gee, III, and William N. Gee, III, Ltd.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on July 21, 2009, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record who have registered to receive electronic service, and I effected service upon all other counsel of record via United States Mail, postage prepaid and properly addressed.

/s/ James M. Garner
JAMES M. GARNER